May it please the Court, Good morning, Paul Gale on behalf of United Infrastructure Projects and I would like to reserve two minutes for rebuttal. Please watch the clock. At its core, we seek an order directing the District Court to convert Gilbane's termination for default into a termination for convenience under the FAR. Under Lisbon Step 1, Gilbane had the burden to show that at the time of termination, Gilbane had an objectively reasonable belief that UIP could not complete the Camp Lemanier project on a properly adjusted completion date. As part of its Step 1 termination analysis, Gilbane was required to give UIP credit for then known excusable delays. So the District Court made a large number of fact findings which were against your client and determining that there were no excusable delays that were appropriate. So wouldn't we have to find that the District Court's factual findings were a clear error and if so, which ones and why? Well, the problem is the District Court never made any such findings on this issue. So if you look at, after you plow through all the factual findings, there are the conclusions of law at ER 23. And conclusions of law 1 through 3, the District Court correctly set forth the FAR and set forth the case law to apply to determine if the default for termination was validly issued. And then in conclusion of law number 4, the District Court then laid out the factual findings followed by the citations to the legal authorities on which it based its decision. But this is critical to the entire appeal on this ground. The District Court did not point to any evidence, either in all of the previous findings of fact or anything else in the record, that validated Gilbane's decision to terminate UIP and that Gilbane had engaged in the actual act of making an evaluation as to whether or not there was a properly adjusted completion date. That's the key. So if there were no excusable delays and the last recovery plan by UIP had said something about 359 days to complete the Camp Leibniz Air Project from the date UIP began preparing its switchgear submittal and the court found there wasn't at that point a compliant switchgear submittal, so that seems then self-evident, that if there are no excusable delays and it's going to take 360 days to complete the project from June 17, 2014, you're not going to meet the December 4, 2014 deadline. So that seems hard to counter unless there were excusable delays, which is why I was asking you about why the District Court's conclusions that there weren't excusable delays was wrong. Well, it wasn't the District Court in 2017 who had the responsibility to make that finding. First of all, the McDonnell Douglas case and the Lisbon case both say relying on the contractor's schedules is not enough. Gilbane had to take a step back and Gilbane itself had to look at all the delay factors and determine whether or not any of those delay factors were excusable. So this is done after the fact. They didn't do that. Okay, so are you saying there should be a rule, a per se rule, that unless there's some writing or chart or some written analysis, then the contractor can't, doesn't have justifiable insecurity and can't terminate the subcontractor? Is that the position you're taking? With a slight modification. The holding of Lisbon and McDonnell Douglas is that the contractor is required to conduct its own independent analysis, relying on the schedule. Are you saying there has to be a written one? I mean, obviously Gilbane determined that it was justifiably insecure and hence terminated it, and the district court found that that was reasonable. So the question is, does there have to be something more, which would it be a written some sort of written document or analysis? So that's why I was asking, is that your position? And I said with a twist, the cases say there has to be an analysis. And what you have to do is look to see what is the properly adjusted completion date. But it doesn't have the the excuse me, properly adjusted, you keep using that terminology, I take it means that there were excusable delays. Is that what you mean by that? That's right. Okay. So could you then turn to the excusable delays that the district court found that there weren't any and tell me why? Yes, Your Honor. I just wanted to say the reason I was saying with a twist is the cases don't necessarily say it has to be in writing. They just have to perform the act. And that's why I said that. And if I perform the act, what do you mean? I mean, to look at all the delays and see what caused them and see who's responsible. I think in today's business world, it would be unlikely that it would all be oral, but there are cases that the decision was made orally. So are you saying that is it your position that Gilbane made a procedural error in not having more paper trail or that there's... So what exactly did Gilbane fail to do? They failed to determine what is the completion date in the face of these known, without whose fault it is, what is the completion date in the face of these known delays. There was a switchgear delay. There was the programming delay. And before we decide whose fault it is, they're supposed to say, in light of those delays, what is the actual revised completion date? And in fact, when Gilbane asked the Navy, and I'm going to get to that in a minute, regarding the programming and the problems with the programming, Gilbane asked for a delay of 262 days. So, and that occurred before the termination. So at least in... The district court found that Gilbane was lying to the Navy. They did. Yes. And that would certainly be a separate issue. But the district court found that, in fact, programming was not on the critical path. And so we would have to determine that that was clearly erroneous. That's correct, Your Honor, and... And why was it clearly erroneous? Well, Exhibit 614, which I think is one of the most important exhibits in the case, was submitted to the Navy on January 5, 2015. It was a compendium of documents that... There was a listing of 17 exhibits that went from middle of 2013 to the end of 2014. There were attachments that totaled in excess of 20. And what it did was it took the problem with the programming. The problem with the programming is this project required the contractor to use CAT, Caterpillar, ISO software for the programming. And the Navy put that in that specification. When the contractor, Gilbane, went to get it, they were told, oh, the Navy really didn't have the right to sublicense that programming and that you're going to have to do something about it. So on February 17, 2014, a submittal was made to the Navy that said, programming is on the critical path, and it wasn't the fault of my client, CIP. Programming was on the critical path, and we need to do something about it. And it was submitted to the Navy. And both parties knew about it, and obviously, Gilbane submitted it. And from that point forward, throughout the rest of... But you're not relying on that submittal by Gilbane, are you? No, I'm not. Because the District Court found that that was false. Well... We need to look at whether it was false or not, right? The District Court found... What the District Court found was all of the submittals going for a full year of 30, 40 documents that were submitted to the Navy, that that plus a time adjustment analysis that was done two days after the termination that said programming was on the critical path. So the District Court pointed to some specific instances which it said proved that programming was not on the critical path, I think. Right. They pointed to the testimony of a Gilbane employee who was the project manager, who was as biased as any witness can possibly be because his project was on the line. And then the District Court pointed to two other exhibits in the month of May that, while he cited to them, if you read the contents, they have nothing to do with programming being on the critical path. And so, in the face of, you know, long-standing federal procurement law that says contemporaneous actions of the parties will be given great, if not controlling weight, he relies on two emails that are irrelevant to the issue and the self-serving testimony. And he says that, well, that tells me that programming really wasn't on the critical path. But it really, if you look at the entirety of the exhibit 614 and why they decided it was on the critical path. Is there a, other than the letter that they sent, they submitted to the January 25th letter, what the date was, is, what is the best evidence that programming was on the critical path? Is there a document that clearly shows that? And could you point us to it? I mean, in addition to the transmittal letter itself, which is nine pages long. Well, the subsequent letter by Gilbane, the district court discounted and said it was false. So, is there something in the, you said there's a huge record that would indicate that programming was on the critical path. And I wanted to know whether you could identify a specific document or page that would make that absolutely clear to me. Yes. So, at first, at page, Exhibit 614, page two. And that, by the way, is docket 30-2 at page 82. And what's the ER site? The ER site is page 82. I'm sorry, the ER site, it's not an ER. There's a problem here with all the, most of the exhibits not being part of the electronic records, so we had to bring a motion to transmit the exhibits to the court. And so, it's trial exhibit, so there were three binders. And this is docket 30-2 at page 82. And that docket says the date, the Navy's programming change, quote, delayed the placement of the order for the switch gear equipment. Then you also have, at page 83, the date the contracting officer issued authorization to proceed with the programming change, established the date for ordering the switch gear equipment. And those are two documents among several that are cited in our brief. I think that if you look at, I think that's all I can give you for now. But the other thing, and this is pretty important, the Executive Vice President of Gilbane expressly certified the submittal to the Navy and said it was in good faith, and it's accurate and complete. And it is replete with exhibits throughout the document that show this. Now, the other document that I would point to is the time impact analysis that was prepared two days after the termination. And if I don't have that at my, I should have that at my fingertips here. Do you still maintain that Lisbon or McDonnell-Dulles maybe both require that time impact analysis be completed prior to the termination? Well, Gilbane had to have done a time impact analysis. Eventually. No, prior to termination. Why do you think that? How can you determine what the properly adjusted completion date is unless you've done a time impact analysis? And then back to the question of law, is there a per se rule or some rule that requires it be done prior to? Yes.  And I have the time impact analysis that was attached to the REA. It's Gilbane Exhibit 56. Okay. Do you want to save the rest of your time for rebuttal? Thank you, Your Honor. Good morning. May it please the court. Nick Merrill for Appellee Gilbane Federal. The court should affirm the district court's judgment because Gilbane one met its burden under Lisbon and UIP is actually the party with the burden of proving excusable delay in this case. And Judge Chabria, the district court correctly held that UIP failed to carry that burden as set forth in paragraph four of his findings, in fact, and conclusions of law. He wrote at ER 24, UIP's delays were not excusable and UIP was not entitled to any time extension that would have come close. Well, was Gilbane required to perform more of an analysis as opposing counsel says than it did before terminating UIP? No. What the case law actually says, first of all, Lisbon, the case upon which UIP relies, is not an excusable delay case. And in fact, if you look at footnote nine of that case, it says, excusable delay is an affirmative defense and the court is not considering that here. It did say, however, that the contracting officer, and by analogy, Gilbane, needs to undertake a quote unquote study of the time left to complete the job and the work left to be done. And Gilbane did that. And the case law says McDonnell Douglas. And in fact, McDonnell Douglas didn't even involve an actual completion date for the A-12 fighter jets. But the court, nonetheless, said, look, you need to undertake an analysis and you can rely upon the contractor's schedules as part of that analysis. Morganti says the same thing. So where is the study that Gilbane undertook in the record? ER 429 to 430, the testimony of Ernie Hogue. And Mr. Hogue testified that essentially he took into account the circumstances existing at the time of termination and made a recommendation upstream to his superiors about the status of the job. He looked at missed commitments in UIP schedules and meeting minutes, UIP's inability to provide a compliant submittal for switchgear, which the Aptos case says is a reflection on lack of progress if you're unable to prepare compliant submittals. The fact that UIP wasn't making progress to cure those deficiencies and the schedules and the recovery schedules that Judge Chabria ultimately relied upon. And as Your Honor correctly pointed out, that last April 2014 recovery schedule is fatal to UIP's case because it projected that UIP needed 359 days to complete the job after it identified a compliant switchgear supplier, which it had yet to do at the time of termination. So the argument of opposing counsel is that because the programming was on the critical path, that those delays in getting the switchgear or in the finding out what the actual date for completion was, was extended. What's your response to that? The district court's findings in that regard are not clearly erroneous because there is a wealth of evidence supporting his conclusion. Let's first look at why the argument as to why programming was allegedly on the critical path. And if you look at Exhibit 614, page 40, which is the switchgear fragment or a portion of a schedule reflecting why the job is being delayed, Gilbane alleged to the Navy that the reason why programming was delaying the job is because you needed to know what type of software to use before you could place the switchgear and before you could fabricate the switchgear. In other words, the lack of knowledge about that type of software impacted a long lead procurement item. But as the district court correctly found, the factual underpinnings of that REA were not accurate. And it's an awkward position for me to be arguing, but that's the truth. You look at what happened on the job adopting opposing counsel's own theory that we should look at what actually happened to inform our judgment. Well, you can't come to any other conclusion than that programming was not on the critical path. Gilbane placed the order for, after terminating UIP, Gilbane placed the order to buy the switchgear on August 21st, 2014, months before the Navy issued direction on what type of software to be used. And in response, Kenny, the supplier, provided Gilbane with a bill of materials to include in a submittal to the Navy in September. How do you know what material if you're going to need to buy and provide if it's somehow being impacted by the software? The engineer of record who designed the system said and testified at trial ER 402 to 403 that it was not necessary to know which type of software to use because in order to fabricate the requisite knowledge that the type of software that is used in the industry would be compatible with the type of products such as protective relays that he would use and that the only components that were dependent on knowing what type of software to use included HMI and SCADA, which are communications hardware, that those components were not necessary to satisfy the Navy's witness testing requirement, which is basically a dry run of the switchgear to make sure it works in Kenny's fabrication plant in Illinois. May I ask you this, if it was known to Gilbane at least around mid-April of the delays UIP was having, why did Gilbane wait until after sending UIP its termination letter on June 22nd to have Kenny supply the switchgear? I mean, it could have been descoped. I think that was at least one of the judge's findings and resumed by Gilbane. But in any case, the real question is why wait until after sending UIP its termination letter to have Kenny supply the switchgear? I think that Gilbane rightly did not want to assume that risk of dictating to UIP which supplier UIP had to use, because then that has contractual significance upon Gilbane. UIP would then be able to argue that Gilbane, you have directed me to use this, quote, de facto sole source supplier, and that was the argument that UIP was making contemporaneously. Which was debunked at some point. I mean, there's at least one other, maybe more suppliers. Right. And so down the line we see this other supplier, SPS, which I identified in my opposition brief, that could at least comply with the switchgear house, and there's evidence that PowerCon could comply with the switchgear itself, and maybe those could be put together. So the issue is how much would that cost? Would there have been an assumption of risk if that portion of the work had been de-scoped? Meaning if Gilbane had de-scoped the switchgear work, then Gilbane would have been responsible, not UIP, and it may have been more timely. That's true, Your Honor. And the other issue is if you de-scope that work from UIP's contract, then the question is, well, that's a pretty large chunk of their work. This was largely a switchgear. And if UIP can't provide the switchgear because it doesn't have the money or resources or competence, then what's to say it will be able to provide the generators? And if it can't provide either of those components, then what's left? And if you deduct all of the value of their subcontract pursuant to deductive change orders, then is UIP going to be able to perform the remaining work on its contract where you're really not going to be paying it very much? So it's a, it created a conundrum and the district court correctly looked at that issue, looked at the termination clause and said, I know there are other remedies available, there were other remedies Gilbane could have exercised, but it was not required to do so as a matter of law. So you're saying these are business decisions? They're business decisions supported by the four corners of the contract that was signed. I want to talk about the impact of UIP's, I guess, admission or waiver would be one way to put it. In page 62 of its brief, it says UIP does not challenge that the project delay period from the subcontracts execution on January 21, 2014 to March 7, 2014 is entirely attributable to UIP. So that's not being challenged. The district court's findings in that regard are not April 2014 recovery schedule, which says basically we need a year from the date of termination to complete the job. There wasn't enough time. There was, there's no time extension that would justify reversing the district court based on that admission. Because if you look at that initial loss of 45 days, it means that even if Gilbane or the Navy is responsible for the remaining 107 days of performance between March 7th and June 22nd, if you push that out and give UIP a time extension on the back end of the December 4th completion date, that only takes you out to March, late March. And at the time of termination, if you look at that recovery schedule from April, it says they need a year from the time of termination to complete the job. You're short by three months. That's not going to get it done. And again, Gilbane is not required to do any kind of robotic or formulaic analysis. It just needs to know enough to know that it has a And that's what those recovery schedules were telling Gilbane. And that's why the district court was right to basically sustain the termination based on that analysis. I won't get into the specific sole source or fourth position indicator issues other than to say there was evidence going back on those issues back and forth, and the district court had to weigh it, and he did. Beyond which, for the fourth position indicator issue, it was something where you have to look at it at the time of termination, not after the fact. And that's what McDonnell Douglas says. Am I correct in understanding that it wasn't impossible to have a fourth position indicator? It was just the Navy determined it didn't need it? Correct. And we had at least two suppliers saying they could do it, Kinney and PowerCon, before termination. And so you have to look at what Gilbane knew at the time, not what they learned later after the fact when the Navy relaxed that specification. Any further questions? Apparently not. No. Okay. Thank you. I'll reserve any remaining time, but I don't think I'll need to. There's no rebuttal for the appellee. Okay. Thank you. So, thank you, Your Honor. Counsel was asked where is the study in the record that Gilbane analyzed what the properly adjusted completion date was. The answer was a reference to trial testimony given three years later. There is no study in the record. And that alone, the fact that they didn't do it, is grounds to reverse. Under the McDonnell Douglas case, the court held the government did not, as it urges, satisfy its burden by merely showing that the contractor was behind schedule. And that's at 10-16. In Lisbon, the court said, you do not satisfy your burden by merely showing that the contractor was behind schedule. I guess they repeated the rule. So, at the very end of counsel's presentation, he said, Gilbane had a reasonable belief UIP will not complete on time. That doesn't get it done under the rules. There is no study in the record. And again, for this court to find that the district court's ruling should be affirmed, they have to, this court has to say Gilbane committed a fraud on the United States Navy and in order to get an extension to the pail, that it just didn't, it's not a fraud. I believe the contents of their exhibit. Okay, your time has expired. Thank you. The case of Gilbane Federal versus UIP is submitted.
judges: Gould, Ikuta, Pearson